GENERAL DYNAMICS CORPORATION vs. FEDERAL PACIFIC
ELECTRIC COMPANY.

Norfolk.  November 13, 1984. — August 30, 1985.

Present: GREANEY, C.J., BROWN, & FINE, JJ.

*Contract*, What constitutes, Implied contract. *Practice, Civil*, Presumptions
and burden of proof, Instructions to jury. *Interest. Warranty.*

At the trial of an action arising from a series of fires in a ship's main electrical
switchboard, which had been provided by the defendant during the ship's
construction by the plaintiff, two unpaid invoices, admitted without
objection as business records of the defendant, were sufficient evidence
to support the jury's verdict for the defendant in its counterclaim for the
value of materials and services it provided to the plaintiff after the fires.
[683-684]
At the trial of an action for breach of warranty, arising from a series of fires
that broke out in the main electrical switchboard on a ship, along with
a counterclaim for the value of materials and services the defendant had
provided the plaintiff after the fires, the judge's instructions as to the
burden of proof on the elements of the counterclaim were proper and
adequate. [684-687]
In an action by a shipbuilder for breach of warranty, arising from damage
caused when fires broke out in an electrical switchboard supplied by the
defendant, with a counterclaim by the defendant seeking payment for
repairs to the switchboard after the fires, the judge erred in awarding
interest on the defendant's recovery on its counterclaim from the date
of the counterclaim, rather than from the date of a letter to the plaintiff
submitting invoices for specific amounts, identified as pertaining to the
fires, inasmuch as the invoices constituted a sufficient demand for pay-
ment for purposes of G. L. c. 231, § 6C. [687]

CIVIL ACTION commenced in the Superior Court on March
10, 1977.
The case was tried before *Herbert Abrams*, J.
*David R. Pierson* for the plaintiff.
*Timothy Q. Feeley (Robert D. Canty* with him) for the de-
fendant.

BROWN, J. In the first three months of 1973, three separate fires broke out in the main electrical switchboard of the S.S. Tillie Lykes, a Seabee class cargo vessel that had been built by the plaintiff, General Dynamics Corporation (General Dynamics), for Lykes Brothers Steamship Company, Inc. (Lykes Brothers). The main switchboard,[1] which is responsible for distributing electricity throughout the vessel, had been supplied to General Dynamics by the defendant, Federal Pacific Electric Company (Federal Pacific), pursuant to a written contract. Under the terms of the contract, Federal Pacific agreed to correct at its own expense, during the guarantee period (six months after the delivery of the vessel), any deficiency or deterioration in workmanship or material furnished by Federal Pacific under the contract, or any failure of any equipment or material to function as prescribed and intended by the technical specifications of General Dynamics' purchase order.

The first two fires, which occurred on January 3[2] and February 5, 1973, took place while the vessel, docked in the Gen-

---

[1] The main electrical switchboard, which is located in the ship's engine room, receives electricity produced by two generators and then distributes this electricity to various pieces of equipment on the vessel (e.g., motors, communications equipment, lights). Specifically, the electricity produced by the generators travels through electrical cable and circuit breakers in the switchboard, and then immediately onto the bus bars of the switchboard (copper plates of various dimensions which carry the electric current throughout the switchboard). The electricity travels along the bus bars, through a distribution circuit breaker and more electrical cable, and then out to particular equipment. The circuit breakers are designed to protect against "over-current"; for example, if a particular piece of equipment develops a problem and the electric current going to that equipment increases significantly, the circuit breaker opens and stops the current, thereby protecting the downstream equipment and cable. Each circuit breaker had two indicating lights to show whether the circuit breakers were open or closed. Neither party contends that the circuit breakers were at fault in any of the fires.

[2] Neither party asserts a claim for damages relative to the January fire.

eral Dynamics' shipyard in Quincy, was undergoing final preparations before delivery to Lykes Brothers. The February fire, which was the more serious of the two fires, severely damaged one of the center sections of the switchboard and knocked the switchboard out of operation for approximately ten days. When this switchboard is down, the vessel is in effect "dead in the water." Since the vessel was scheduled to be delivered to Lykes Brothers in March of 1973, General Dynamics' primary concern was to get the switchboard in operating condition as quickly as possible.

Indeed, immediately after the February 5 fire, General Dynamics called upon Robert Yundt, the local Federal Pacific sales representative who was responsible for the General Dynamics account. Yundt arrived at the Quincy shipyard that afternoon. Sometime thereafter, Paul Happel, an electrical engineer with General Dynamics who supervised the repair work on the switchboard following the February fire, asked Yundt to obtain replacement parts for the switchboard. Yundt then sought a purchase order from Eddie Gebauer, a buyer in General Dynamics' purchasing department,[3] but Gebauer did not know which parts had to be replaced. Yundt's response to Gebauer was that "the important thing is to get the ship back on schedule, so we'll replace the parts and then . . . send you some billing afterwards." Moreover, Yundt testified at trial that both Happel and Gebauer told him that they would get a purchase order at a later date.[4] Apparently, no such purchase order was issued

---

[3] Gebauer was responsible for administering the switchboard contract. Both Happel and Gebauer died prior to trial.

[4] Normally, Federal Pacific requires a purchase order from a customer before it will instruct the factory to produce the particular parts. Similarly, General Dynamics does not usually place a verbal order for parts or services unless the order is backed up by an actual purchase order number. However, Warren Freeman, currently manager of electrical engineering for General Dynamics' shipbuilding division, agreed that the February fire was the sort of situation where parts would be ordered without a written purchase order. Freeman also testified that Yundt, in conjunction with General Dynamics personnel, "put together a list of parts and . . . called the home office to start the procedure of getting those parts back into the [Quincy] yard prior to a formal purchase order."

by General Dynamics following this fire. However, a General Dynamics report, dated February 8, 1973, includes the following notation: "Request vendor services [and] mat[erial] required to repair main [switchboard] — Responsibility not determined."

On February 6, additional Federal Pacific personnel, including Douglas Ball, the engineer who designed the switchboard components for the General Dynamics' contract, arrived on the scene to investigate the cause of the blaze and to determine which switchboard components had to be replaced. Subsequently, Federal Pacific supplied General Dynamics with the necessary replacement parts and the switchboard was refurbished, cleaned, and tested by General Dynamics personnel under the supervision of two Federal Pacific field service engineers, Ted Jania and Ben Moore. On or about February 15, the switchboard was back in operation.

General Dynamics delivered the Tillie Lykes to Lykes Brothers on March 16, 1973. One week later, on March 23, a third fire broke out in the main electrical switchboard while the vessel was secured at the Todd Shipyards' dry dock in Galveston, Texas. The fire started after Lykes Brothers personnel had started the machinery for the vessel's barge elevator platform. Paul Happel arrived in Galveston the following day and conducted a complete examination of the switchboard. Various parts in section five (one of the center sections of the switchboard) were destroyed in the fire. The damage to the switchboard from the fire was very similar to the damage sustained from the February fire. In his report of this third fire, Paul Happel noted, "Advance ordering of material needed to rebuild switchboard was accomplished." In addition, Todd Shipyards' personnel were engaged to assist in the repair of the switchboard.

Douglas Ball and other Federal Pacific engineers arrived in Galveston on March 27 after being notified of the fire by General Dynamics. Ball recommended that certain other switchboard components be replaced.[5] The necessary replace-

---

[5] In his report of the Tillie Lykes's fires, dated November 21, 1973, Douglas Ball noted, following an inspection of the switchboard in Galveston,

ment parts for the switchboard were supplied by Federal Pacific. Repair work was carried out by Todd Shipyards' personnel under the direction of Happel and Federal Pacific engineers. Final inspection of the switchboard was completed on April 12, 1973, and, four days later, the vessel departed for New Orleans.

Following the fires, there were various tests, discussions, and reports by the parties as to the cause of the Tillie Lykes's fires, but no agreement was reached. In particular, the parties met in Quincy on December 19, 1973, to discuss the cause of the fires. General Dynamics contended that there were design deficiencies in the switchboard, specifically in relation to the indicating light system. In contrast, Federal Pacific took the position, based on a report by Douglas Ball, dated November 21, 1973, that the fires were caused by contamination (dirt and other foreign material) in the switchboard. Subsequently, Federal Pacific refined its theory and claimed that contamination together with an overvoltage condition had caused the fires.

On January 10, 1974, Federal Pacific wrote to General Dynamics, summarizing its position on the Tillie Lykes's fires and enclosing two invoices for material and field service work furnished by Federal Pacific after the February and March fires. The invoices simply list various parts and their cost, and the cost for the services of its engineers. In the space provided for the purchase order number there is marked the word "verbal." By a letter dated January 23, General Dynamics acknowledged receipt of Federal Pacific's January 10 letter. On May 21, 1974, and August 27, 1974, Federal Pacific requested that General Dynamics approve and pay the two invoices. General Dynamics also timely notified and submitted invoices to Federal Pacific for Lykes Brothers' backcharge of General Dynamics as a result of the March fire. General Dynamics did

---

that it was decided that "every circuit breaker mounting assembly installed in the main switchboard be replaced. It was also decided that a number of bus support insulators [in the main switchboard] . . . be replaced." Ball's report also indicates that "[m]ost of the control and indicator wiring in the distribution sections . . . and most of the indicator lights in the center distribution sections were replaced.

not make payment on the invoices. Federal Pacific denied any responsibility for the backcharge.

On March 10, 1977, General Dynamics filed a complaint against Federal Pacific, seeking damages, based upon theories of breach of warranty and common law indemnity, for the costs it had incurred following the March fire. Federal Pacific answered and counterclaimed, seeking the price of the materials and services provided to General Dynamics after the February and March fires.

At the close of Federal Pacific's evidence and at the close of all the evidence, General Dynamics filed a motion for a directed verdict on Federal Pacific's counterclaim, which was denied. The case was submitted to the jury by way of general verdict slips. The jury found for Federal Pacific in the case-in-chief. On the counterclaim, the jury also returned a verdict for Federal Pacific in the amount of $63,170.39, the total amount of the two Federal Pacific invoices. On December 21, 1983, judgment was entered for Federal Pacific in the case-in-chief, and on its counterclaim in the amount mentioned with interest computed from May 2, 1977, the date Federal Pacific's answer and counterclaim were originally filed. General Dynamics' motion for judgment notwithstanding the verdict (on Federal Pacific's counterclaim) was denied. In addition, Federal Pacific, by motions to amend the judgment, asserted that the interest on its award should run from January 10, 1974, the date upon which it forwarded the invoices to General Dynamics. The motions were denied.

On appeal, General Dynamics asserts (1) that there was insufficient evidence of Federal Pacific's alleged damages to allow the jury to find in Federal Pacific's favor on the counterclaim and, hence, General Dynamics' motions for a directed verdict and for judgment notwithstanding the verdict should have been allowed and (2) that the judge erred in refusing to incorporate in his charge two requested jury instructions concerning Federal Pacific's burden of proof on its counterclaim. Federal Pacific has also appealed, claiming error in the denial of its postjudgment motions to correct the interest award.

1. *Sufficiency of the Evidence*.

General Dynamics' motions for a directed verdict and for judgment n.o.v. were properly denied. The jury could have found or fairly inferred from the evidence most favorable to Federal Pacific (a) that Federal Pacific had agreed to supply materials and services to General Dynamics upon the latter's request following the February and March fires, (b) that Federal Pacific reasonably expected payment for the same, and (c) that General Dynamics had or should have had reason to know that payment was expected. See *LaChance* v. *Rigoli,* 325 Mass. 425, 427 (1950); *Douillette* v. *Parmenter,* 335 Mass. 305, 307 (1957); *Mazeikis* v. *Sidlauskas,* 346 Mass. 539, 543-544 (1963); *LiDonni, Inc.* v. *Hart,* 355 Mass. 580, 583 (1969); *Anisgard* v. *Bray,* 11 Mass. App. Ct. 726, 729 (1981); *Robert Trent Jones, Inc.* v. *Canter,* 19 Mass. App. Ct. 321, 324 (1985).

Two Federal Pacific invoices, which reflect the materials and services provided to General Dynamics in February and March and the costs thereof, were admitted in evidence under the business record statute (G. L. c. 233, § 78) without objection. General Dynamics stipulated at trial that the invoices had not been paid. The invoices, which were unrebutted, constitute competent evidence of (a) "a sale to the person named," see *Chadwick & Carr Co.* v. *Smith,* 293 Mass. 293, 296 (1936), and (b) the value of the goods and services provided. See *Standard Oil Co.* v. *Malaguti,* 269 Mass. 126, 129 (1929). In *Standard Oil,* which involved an action for goods sold and delivered, a sales ledger containing charges for oil and gas delivered to the defendants at various times[6] was introduced in evidence under G. L. c. 233, § 78. As in the instant case, the defendants claimed that they did not request or agree to pay for the oil and gas, and that there was no evidence of the reasonable value of the goods mentioned. In upholding a judgment for the seller, the court held that an inference drawn from the sales ledger, alone, was "sufficient

---

[6] The charges were posted in the sales ledger from invoices. See *Standard Oil Co.* v. *Malaguti, supra* at 128.

to show all the necessary elements required to prove a sale of goods, and delivery of the goods to the defendants for a price." *Standard Oil*, 269 Mass. at 129. See also *Ogden Good Serv. Corp.* v. *Mitchell*, 614 F.2d 1001, 1004 5th Cir. 1980) (unpaid invoices are evidence of the value of the goods provided). Here, the trial judge properly instructed the jury that they were to determine what weight should be given to the invoices based on the facts of the case. We think the jury were warranted in concluding the invoices represented the amount owed.[7]

2. *Jury Instructions.*

General Dynamics also claims that the judge erred in refusing to instruct the jury that Federal Pacific had the burden (a) of establishing the existence and terms of an agreement by General Dynamics to pay for the materials and services supplied, and (b) of proving that it (Federal Pacific) was not responsible for the February and March fires. A judge has wide discretion in framing the actual language used, and a good objection to a charge "will lie only if a critical issue was not dealt with at all or was dealt with erroneously as a matter of law." *Torre* v. *Harris-Seybold Co.*, 9 Mass. App. Ct. 660, 678-679 (1980). Reviewing the charge as a whole and in the context of the evidence, see *Back* v. *Wickes Corp.*, 375 Mass. 633, 638 (1978), we observe no error.

The judge charged the jury on the general principles of warranty law and instructed them that General Dynamics had the burden of proving that the cause of the March fire was one for which Federal Pacific was responsible under the warranty.[8] The judge explained that if the jury should find in favor of General Dynamics on its complaint, they "would be required as

---

[7] We note in passing that General Dynamics' argument (that Federal Pacific failed to offer sufficient proof of its alleged damages) is inconsistent with the tactic it employed at trial. General Dynamics introduced invoices from Lykes Brothers, under the business record statute, and requested the trial judge to instruct the jury that the invoices constituted "prima facie evidence" of the amount backcharged to General Dynamics for the March fire. The judge gave such an instruction to the jury.

[8] The jury's verdict in favor of Federal Pacific in the case-in-chief established that the plaintiff did not meet that burden, i.e., had not shown that the March fire was caused by Federal Pacific.

a matter of law to find against Federal Pacific on its counterclaim . . . because any expenses incurred by Federal Pacific to repair the switchboard . . . were as a result of its contractual obligation with General Dynamics under the express warranty." The judge also instructed the jury that "if you should find that General Dynamics has failed to sustain its burden [in the case-in-chief], . . . you could still find in favor of Federal Pacific on its counterclaim of $63,170.39, if you find that the [costs of the] parts supplied and other expenses incurred by it in repairing the switchboard at the request of General Dynamics [were] fair and reasonable and were otherwise established with reasonable certainty."

On the counterclaim, General Dynamics, by interposing the defense of breach of warranty, had the burden of proving that the fires were caused by a switchboard deficiency or a failure covered under the express warranty. See, e.g., *Whiting Corp.* v. *Process Engr., Inc.,* 273 F.2d 742, 745-746 (1st Cir. 1960); *Nicholson* v. *American Hide & Leather Co.,* 307 Mass. 456, 461-462 (1940), and cases cited therein. See also *Central Soya Co.* v. *Epstein Fisheries, Inc.,* 676 F.2d 939, 944 (7th Cir. 1982). We do not accept General Dynamics' arguments that *Starratt* v. *Mullen,* 148 Mass. 570 (1889) (Holmes, J.), points to a different conclusion. In *Starratt,* where suit was brought for goods sold and delivered and money lent, the defendant offered evidence that tended to show that the items had not been furnished "for pay to be received thereafter." *Id.* at 571. In *Starratt* the court held simply that the plaintiff (seller) "must prove that the goods or services were furnished for a reward to be paid thereafter in money." *Id.* Here, there was no dispute that General Dynamics received the parts, which were then installed in the Tillie Lykes's switchboard. Federal Pacific offered sufficient evidence from which the jury could find or infer that the parts and services were supplied at General Dynamics' request and in expectation of payment. Compare *Anisgard* v. *Bray,* 11 Mass. App. Ct. at 730-731. Thus, General Dynamics, the party asserting the breach of warranty, had the burden of proving such a breach (*Whiting Corp.* v. *Processing Engineering, Inc., supra.*) and, therefore, that Federal Pacific

had an obligation to provide the materials and services free of charge.[9]

In addition, viewed in context, the judge's instructions regarding Federal Pacific's counterclaim were adequate. Federal Pacific had pleaded and tried its claim at trial on the basis of a contract implied-in-fact. See *Grant* v. *Carlisle*, 328 Mass. 25, 29 (1951). The jury were charged, on two separate occasions, that they could find for Federal Pacific only if they found that the cost of "the parts supplied and other expenses incurred by it [Federal Pacific] in repairing the switchboard at the request of General Dynamics [were] fair and reasonable and were otherwise established with reasonable certainty."[10] The thrust of General Dynamics' requested instructions was that there was an implied promise by General Dynamics to pay only on the condition that Federal Pacific was not responsible for the fire. During a colloquy, counsel for General Dynamics stated, "I would ask that Your Honor instruct that the jury has to find what the terms of the implied contract are; that one of the implied terms the jury might find, is that General Dynamics had agreed to pay for the parts only if the fire was not the result of something [for] which Federal Pacific was responsible." A judge "is not required to frame his instructions in the form requested by counsel so long as the charge is correct and complete in its essentials." *Leech* v. *Ebers*, 12 Mass. App. Ct. 1004, 1005 (1981). The judge properly refused to give this instruction, as it misconceived the elements of a claim for goods sold and delivered and services rendered. As a defense to the claim, General Dynamics had the burden of

---

[9] We note in passing that Ball's statement that Federal Pacific proceeded with the replacement and repair of the switchboard (after the February fire) "in a warranty situation" has no material effect on the result here because General Dynamics had the burden of proving Federal Pacific was in breach of its warranty.

[10] The instruction could be interpreted as assuming a fact in controversy (i.e., General Dynamics requested parts and services following the March fire), see G. L. c. 231, § 81, but no objection was registered by General Dynamics. In view of the evidence, we believe the instruction does not rise to the level of reversible error.

proving Federal Pacific was responsible for the fire. The judge's instructions properly placed such a burden on General Dynamics.

3. *Interest Computation.*

Federal Pacific submitted the invoices to General Dynamics by letter, dated January 10, 1974. General Dynamics acknowledged receipt of the letter on January 23, 1974. General Dynamics, however, did not make payment against the invoices. On May 21 and August 27, 1974, Federal Pacific requested (by letter) that General Dynamics approve and pay the invoices. Upon entry of the judgment on the verdict for Federal Pacific on its counterclaim, interest was computed from the date Federal Pacific's answer and counterclaim were filed (May 2, 1977). In his order denying Federal Pacific's motion to amend the judgment, the judge stated that the aforementioned letters, "when read together, do not establish with sufficient certainty that a demand for payment was made on January 10, 1974 as contemplated by G. L. c. 231, § 6C." Under G. L. c. 231, § 6C, interest is to be added to the amount of damages in contract actions "from the date of the breach or demand." See also *Sterilite Corp.* v. *Continental Cas. Co., ante* 215, 218 (1985), further appellate review granted, 395 Mass. 1103 (1985). The statute further provides that, "If the date of the breach or demand is not established, interest shall be added . . . from the date of the commencement of the action."

The Supreme Judicial Court has held that a "demand" for purposes of G. L. c. 231, § 6C, is satisfied if the party charged is informed "of the basis and extent of its obligation, as well as the fact that performance [is] then due." *Lexington* v. *Bedford,* 378 Mass. 562, 576 (1979). The invoices, which are for specific amounts and are identified as pertaining to the Quincy and Galveston fires, met that formulation. There is nothing in the invoices to indicate that they are anything but unequivocal demands for payment. Accordingly, the order denying Federal Pacific's motion to amend the judgment with respect to the counterclaim is reversed, and the judgment is to be amended to include interest from January 10, 1974. As so amended, the

judgment is affirmed. In addition, the judgment with respect to the case-in-chief is affirmed.

*So ordered.*