# United States Court of Appeals

## For the First Circuit

No. 07-1452

BOSTON GAS COMPANY,
d/b/a KEYSPAN ENERGY DELIVERY,

Plaintiff, Appellee,

v.

CENTURY INDEMNITY COMPANY,

Defendant, Appellant.

_____

CERTAIN UNDERWRITERS AT LLOYD'S LONDON;
CERTAIN LONDON MARKET INSURANCE COMPANIES;
TRAVELERS CASUALTY AND SURETY COMPANY;
ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED;
AETNA CASUALTY & SURETY COMPANY;
THE HARTFORD INSURANCE COMPANY,

Third-Party Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Boudin, Chief Judge,

Selya, Senior Circuit Judge,

and Gelpi,* District Judge.

_____

*Of the District of Puerto Rico, sitting by designation.

Guy A. Cellucci with whom Shane R. Heskin, White & Williams LLP, David B. Chaffin and Hare & Chaffin were on brief for appellant.

David L. Elkind with whom John A. Gibbons and Dickstein Shapiro LLP were on brief for appellee.

William G. Passannante, Eugene R. Anderson, Anderson Kill & Olick, P.C., Amy Bach and Law Offices of Amy Bach on brief for United Policyholders, Amicus Curiae.

Robert J. Gilbert and Gilbert & Renton LLC on brief for Invensys Systems, Inc., Amicus Curiae.

---

June 10, 2008

---

**BOUDIN**, **Chief Judge**.  This is a dispute between Boston Gas Company ("Boston Gas"), the largest provider of natural gas in the New England area, and one of its insurers, Century Indemnity Company ("Century").  Before natural gas became the primary source of energy in New England, Boston Gas produced gas fuel at facilities called manufactured gas plants, known in the industry as "MGPs".  These MGPs created gas by heating coal in large ovens, generating gas which was then purified and piped out for use.

This process also produced a variety of byproducts, including ash, drip oil, tar and coke.  Many are non-biodegradable and some are deemed carcinogenic, and they now contaminate the ground and water around many former MGP sites; further, MGPs were often sited near waterways which were contaminated in turn.[1]  See EnergyNorth Natural Gas, Inc. v. Century Indem. Co., 452 F.3d 44, 46-47 (1st Cir. 2006).  Contamination has been discovered at twenty-nine former Boston Gas MGPs; this case concerns only one of those sites, located in Everett, Massachusetts.

Boston Gas operated the Everett MGP from 1908 until approximately 1969; the MGP produced manufactured gas and also processed coke oven gas purchased from a nearby coke plant.  In 1995, a routine investigation uncovered contamination at the

---

[1]The main contaminant in this case was tar--the chief liquid byproduct of manufactured gas production.  At nearly all MGP sites some tar escaped confinement and leaked into the environment; once that leakage occurs, tar tends to migrate and to contaminate soils and groundwater beyond the borders of the facility's site.

Everett site. Although the Everett site had been sold to a new owner (DOMAC, LLC) in 1970, Boston Gas was nevertheless strictly liable under Massachusetts law for all costs associated with the investigation and cleanup of the contamination caused by the MGP's operations.

Boston Gas had purchased three general commercial liability insurance policies from Century covering the period from December 1, 1951, through December 1, 1969. Each policy contained a self-insured retention ("SIR")--essentially a deductible--of $100,000 for each occurrence resulting in personal injury or property damage. Above the deductible amount, the policies provided that Century would cover Boston Gas' "ultimate net loss" up to the applicable limits of the policies for any liabilities stemming from bodily injury, property damage, or other harm caused by an "occurrence." An "occurrence," said the policies, was

> an accident, including injurious exposure to conditions, which results, during the policy period, in property damage neither expected nor intended from the standpoint of the [i]nsured.

After Boston Gas investigated and began to clean up the contaminated soils and groundwater at and near the Everett site, Boston Gas warned Century that it might seek indemnification. Century "reserved its rights," and on October 22, 2002, Boston Gas filed a diversity law suit against Century in the federal district court, seeking a declaratory judgment as to Century's obligations

-4-

under the policies and damages for its breach thereof. A three-week long jury trial followed, focusing upon the Everett site.[2]

Boston Gas argued in the district court that to recover under the policies, it needed to prove only that an occurrence had caused some off-site property damage during the policy periods-- off-site because the policy had an "owned property" exclusion for damage to Boston Gas' own property. Off-site damage, in Boston Gas' view, required Century to indemnify Boston Gas for all its liabilities connected to the occurrence. Century responded that various exclusions contained in the policies precluded or limited indemnification.

Importantly, Century argued that Boston Gas was well aware by 1951 that pollution from the Everett MGP was causing property damage at or near the site; the costs were therefore barred by an exclusion requiring that the property damage be "neither expected nor intended" by the insured. Century also argued that Boston Gas improperly sought to recover costs expended to repair and improve the Everett site itself, rather than to remediate or prevent off-site property damage.

At trial, the jury awarded Boston Gas over $6.1 million in past remediation expenses; the district court also issued a

---

[2]The other twenty-eight Boston Gas MGPs remain the subject of a larger dispute. Boston Gas intends to use the outcome of the Everett trial as an exemplar to establish its rights against Century with respect to the other sites.

declaratory judgment obligating Century to pay all future costs associated with the investigation and environmental cleanup of the Everett site. Century now appeals on multiple grounds from the district court's judgment. As usual, the standard of review depends on the issue. Indianapolis Life Ins. Co. v. Herman, 516 F.3d 5, 8 (1st Cir. 2008).

Allocation among insurers. Century's most far-reaching claim is that the district court should have limited Century's liability by allocating Boston Gas' liabilities among all insurers from whom Boston Gas had purchased general commercial liability insurance during the Everett MGP's lifespan. Century insured Boston Gas under various policies from 1951-1969,[3] while other insurers covered Boston Gas during other periods of its century-long operation.

Century does not now dispute the jury's finding that the Everett site suffered contamination during the 1951-1969 time period. Indeed, contamination seemingly occurred over a much longer period, even though no findings were made as to duration. Rather, renewing an argument made in the district court, Century says that manifestly not all of the damage could have been caused

---

[3]The terms of the policies varied. The 1960-66 policy had a per occurrence limit of $1 million and a SIR of $100,000. The 1966-69 policy contained a limit of $17 million and a SIR of $100,000. The 1951-60 policy was lost, but the jury found that the policy had a $1 million policy limit in 1951 and from 1955-1960, and a limit of $500,000 from 1952-1954. The jury did not determine the lost policy's self-insured retention limits.

during its limited period of insurance and its liability should be no more than its proportionate share.  It also urges that its share should be spread among its various policy years.[4]

The district court instead applied a method of allocation referred to in the doctrine as the joint and several, or "all sums," approach and permitted Boston Gas to recover from Century its total clean-up liability--subject only to the SIR and policy limit--under any one of its policies in place between 1951 and 1969.  Not surprisingly, Boston Gas selected the policy with the highest coverage limit--$17 million--and Century was held fully liable for $6,227,327.90 in damages, less that policy's $100,000 SIR.

On appeal, arguing for pro rata allocation, Century highlights the policy language--the underscoring is ours--defining an occurrence as "an accident . . . which results, <u>during the policy period</u>, in property damage."  It asserts that it is not responsible for damage that occurred outside of the policy period, so proration among insurers is required.  Boston Gas counters that the policy says nothing about proration, so given an occurrence-- which includes "continuous or repeated exposure to substantially

---

[4]In substance Century wants any award reduced by its policies' self-insured retention of $100,000 for <u>each</u> year of contamination, arguing that this approach is consistent with Massachusetts' requirement that an insured exhaust all available underlying primary insurance.  <u>A.W. Chesterton Co.</u> v. <u>Mass. Insurers Insolvency Fund</u>, 838 N.E.2d 1237, 1254 (Mass. 2005).

-7-

the same general conditions"--within the policy period, Century is liable for the "'ultimate net loss' mean[ing] the sum actually paid or payable" by the insured.

This dispute commonly arises in the context of environmental damage and toxic exposure disputes--so-called "long-tail" indivisible injuries attributable to ongoing events without a single clear "cause." See Russ & Segalla, 15 Couch on Insurance § 220:25 (3d ed. 2007). The language of traditional comprehensive general liability policies--drafted before such law suits became common--does not neatly map onto these types of injuries. Hickman & DeYoung, Allocation of Environmental Cleanup Liability Between Successive Insurers, 17 N. Ky. L. Rev. 291, 292 (1990).

Competing methods have emerged. Some courts have deemed insurers fully liable--normally, jointly and severally--for all damages attributable to an occurrence, exposure or contamination that happened at least in part during the coverage period. See Keene Corp. v. Ins. Co. of N. Am., 667 F.2d 1034, 1050 (D.C. Cir. 1981). Others have prorated an insurer's liability, based largely, but not always exclusively, on the number of years during which coverage was offered. See Ins. Co. of N. Am. v. Forty-Eight Insulations, Inc., 633 F.2d 1212, 1224-25 (6th Cir. 1980); Owens-Illinois, Inc. v. United Ins. Co., 650 A.2d 974, 993-94 (N.J. 1994). The parties agree that Massachusetts law governs here.

Unfortunately, the Massachusetts Supreme Judicial Court has not yet resolved this allocation question, A.W. Chesterton Co. v. Mass. Insurers Insolvency Fund, 838 N.E.2d 1237, 1242 n.3 (Mass. 2005) (expressly reserving the issue), so our choices are two: we can make our best guess on this de novo review issue, or we can certify the question and ancillary issues to the SJC. The first path offers the benefit of expedition but with a risk of error; the second path, the reverse.[5]

Although there is one Massachusetts Appeals Court decision on point, its treatment of the choice between the two allocation methods is cursory. Rubenstein v. Royal Ins. Co. of Am., 694 N.E.2d 381, 388 (Mass. App. Ct. 1998); see also Chicago Bridge & Iron Co. v. Certain Underwriters at Lloyd's, London, 797 N.E.2d 434, 441-45 (Mass. App. Ct. 2003) (adopting joint and several allocation, but as a matter of Illinois law). Nor is there a clear consensus among the states as to which method is preferable. A growing plurality have adopted some form of pro rata

---

[5]Century sought certification of the allocation question before the district court. The district court stated that it believed itself to be "compel[led]" by Rubenstein v. Royal Insurance Co. of America, 694 N.E.2d 381, 388 (Mass. App. Ct. 1998), to adopt the joint-and-several approach, but based its denial of the motion on the fact that the allocation question was not outcome determinative. See Mass. S.J.C. Rule 1:03 (certification appropriate only when the disputed question of law "may be determinative of the cause").

allocation,[6] but a significant number of courts impose joint and several allocation.[7]

Nor do policy arguments line up solely behind one solution. At first blush it may seem illogical to hold a single insurer, who may have only covered the insured for a single year, fully liable for the costs of environmental damage that may have accrued over the course of a century. But that insurer can seek contribution from other insurers "on the risk" during the contamination period. See, e.g., Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co., 769 N.E.2d 835, 841 (Ohio 2002). And the alternative may force the insured to sue numerous companies in one suit, if this is possible at all, to avoid inconsistencies.

---

[6]See EnergyNorth Natural Gas, Inc. v. Certain Underwriters at Lloyd's, 934 A.2d 517, 526 (N.H. 2007); Aetna Cas. & Sur. Co. v. Commonwealth of Kentucky, 179 S.W.3d 830, 842 (Ky. 2005); Sec. Ins. Co. of Hartford v. Lumbermens Mut. Cas. Co., 826 A.2d 107, 121 (Conn. 2003); Atchison, Topeka & Santa Fe Ry. Co. v. Stonewall Ins. Co., 71 P.3d 1097, 1134 (Kan. 2003); Consol. Edison Co. of N.Y. v. Allstate Ins. Co., 774 N.E.2d 687, 695 (N.Y. 2002); Pub. Serv. Co. of Colo. v. Wallis & Cos., 986 P.2d 924, 935 (Colo. 1999); Domtar, Inc. v. Niagara Fire Ins. Co., 563 N.W.2d 724, 732 (Minn. 1997); Sharon Steel Corp. v. Aetna Cas. & Sur. Co., 931 P.2d 127, 140-42 (Utah 1997); Owens-Illinois, 650 A.2d at 993-94.

[7]See Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co., 769 N.E.2d 835, 841-42 (Ohio 2002); Hercules, Inc. v. AIU Ins. Co., 784 A.2d 481, 494 (Del. 2001); Allstate Ins. Co. v. Dana Corp., 759 N.E.2d 1049, 1058 (Ind. 2001); Am. Nat'l Fire Ins. Co. v. B & L Trucking & Constr. Co., 951 P.2d 250, 256-57 (Wash. 1998); J.H. France Refractories Co. v. Allstate Ins. Co., 626 A.2d 502, 507-08 (Pa. 1993).

Either method forces courts to indulge in a probable fiction as to when the event triggering coverage occurred. The pro rata method assumes an ongoing occurrence causing stable amounts of damage over time; the joint and several method pretends, even less plausibly, that a single occurrence caused all the damage, and allows the insured effectively to choose the year in which that happened. Both are crude approximations made under conditions of uncertainty.

Pro rata allocation is generally favored by insurers; insureds usually prefer joint and several allocation as it alleviates the need for multiple defendants and possibly multiple lawsuits. Yet in those jurisdictions that employ the joint and several method, but limit the insured to making a claim against a single policy--a method sometimes referred to as joint and several allocation without stacking, Am. Physicians Ins. Exch. v. Garcia, 876 S.W.2d 842, 853-54 (Tex. 1994)--the insured may collect less than it would have under pro rata allocation. Bratspies, Splitting the Baby: Apportioning Environmental Liability Among Triggered Insurance Policies, 1999 BYU L. Rev. 1215, 1258.

Each method also has secondary implications, which courts have variously viewed as more or less desirable. One example is so-called "orphan shares," i.e., damages attributable to years during which the insured "went bare" or purchased coverage from a now-insolvent insurer. Pro rata allocation usually (although not

inevitably) treats the insured as self-insuring for those years, a result that some courts view (appropriately) as preventing a windfall, EnergyNorth, 934 A.2d at 526; others as (inappropriately) depriving the insured of expected protection. Keene, 667 F.2d at 1048-49. The two approaches also differ in the incentives they create for settlements, in their tendency vel non to consolidate litigation in one case, and in their treatment of policy deductibles and excess insurance policies.

For example, under pro rata allocation, the insured will seek coverage from each insurance policy in effect during the contamination period and is likely to absorb the self-insurance retentions of each policy, Pub. Serv. Co. of Colo. v. Wallis & Cos., 986 P.2d 924, 941 (Colo. 1999), while excess insurance policies offering coverage only for damages above that prorated amount will not be triggered. By contrast, under joint and several liability all damages are attributable to a single year; ordinarily the insured is responsible for a single deductible and, given the large sums ordinarily sought, it becomes more likely that excess insurance will be activated.

That a legal issue is close or difficult is not normally enough to warrant certification, or else diversity cases would regularly require appellate proceedings in two courts. But the dollar amounts involved in this and the follow-on cases for other sites are very large (see note 2, above); and the allocation method

-12-

could easily matter in future cases not involving these parties. Although Massachusetts judicial policy is often favorable to the insured, at least in consumer cases, sister courts in New York, New Hampshire and Connecticut have adopted the pro rata approach. See note 6, above.

Perhaps the strongest argument for certification is that even within the two broad schools of thought, there are additional nuances complicating any prediction by us of Massachusetts law. For instance, in joint and several allocation courts divide on whether an insured is allowed to "stack" multiple policies to obtain coverage for all their damages; for pro rata allocation, some courts allocate damages based purely upon the number of years of coverage, while others allocate based on both years and amounts of coverage offered.[8]

Because we have found no controlling SJC precedent on the allocation question and the issue is determinative of the scope of Boston Gas' claim, we will certify the questions set forth at the

_____

[8]Compare Keene, 667 F.2d at 1049 (allowing insured to seek coverage only under a single policy), with J.H. France, 626 A.2d at 509 (adopting joint and several allocation with stacking), and compare Pub. Serv. Co. of Colorado, 986 P.2d at 942 (proration by years), with Owens-Illinois, 650 A.2d at 993 (proration by years and limits). See Gillespie, The Allocation of Coverage Responsibility Among Multiple Triggered Commercial General Liability Policies in Environmental Cases: Life After Owens-Illinois, 15 Va. Envtl. L.J. 525, 535 (1996) (listing various permutations of the pro rata and joint several allocation methods).

close of this decision to the Massachusetts Supreme Judicial Court in accordance with Mass. S.J.C. Rule 1:03.

Apportionment of recoverable costs. We now turn to a connected pair of issues: Century's claim that the district court failed properly to instruct on the "owned-property exclusion" contained in Century's policies[9] and its separate claim for judgment as a matter of law as to costs incurred incident to DOMAC's expansion project. The issues both relate to apportionment between recoverable and unrecoverable costs and both relate in part to the DOMAC construction.

Review of the legal correctness of an instruction is de novo, Cigna Ins. Co. v. Oy Saunatec, Ltd., 241 F.3d 1, 8 (1st Cir. 2001), with deference as to phrasing and emphasis, United States v. Teemer, 394 F.3d 59, 63 n.2 (1st Cir. 2005). On appeal from the denial of a motion for judgment as a matter of law, the question usually is whether, drawing all inferences in favor of the verdict, the evidence permitted a reasonable jury to render a verdict adverse to the moving party. FHS Props. Ltd. P'ship v. BC Assocs., 175 F.3d 81, 85 (1st Cir. 1999).

---

[9]Boston Gas argues that claims of jury misinstruction were not adequately preserved. Having read the pertinent parts of the record, we are satisfied that Century made its objections clear at the charge conference, as required by Fed. R. Civ. Pro. 51(c) and the case law. See Suprenant v. Rivas, 424 F.3d 5, 15 (1st Cir. 2005).

Each of the policies Boston Gas purchased from Century contained a clause stating that "[t]his policy does not apply . . . to property damage to . . . property owned by the [i]nsured." Such clauses--like other exclusions--provide the insurer with an affirmative defense to liability, placing the burden on the insurer to exclude damage otherwise recoverable. Allmerica Fin. Corp. v. Certain Underwriters at Lloyd's, London, 871 N.E.2d 418, 425 (Mass. 2007). However, this does not mean that costs of remediation of the Everett site itself are automatically excluded.

The governing Massachusetts decision on the owned-property exclusion in environmental spill cases is Hakim v. Massachusetts Insurers' Insolvency Fund, 675 N.E.2d 1161 (Mass. 1997). There the court held that when pollutants have migrated from the insured's property to an adjacent property--or perhaps even when the threat of such migration is imminent--"coverage [to remediate the insured's property] is not barred if the [on-site] cleanup is designed to remediate, to prevent or to abate further migration of contaminants to the off-site property." Id. at 1164 & n.8 (emphasis added).[10]

The special verdict form asked the jury: "Was the cost of remediation at the Everett site incurred solely to clean up the

_____

[10]Accord Patz v. St. Paul Fire & Marine Ins. Co., 15 F.3d 699, 705 (7th Cir. 1994) (Wisconsin law); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1565-66 (9th Cir. 1991) (California law); Gerrish Corp. v. Universal Underwriters Ins. Co., 947 F.2d 1023, 1030-31 (2d Cir. 1991) (Vermont law).

property of Boston Gas Company, as opposed to eliminating and/or avoiding, at least in part, contamination of ground water or adjacent property?" A "yes" answer would have barred recovery; a "no" answer--which the jury returned--required the jury to specify "the amount Boston Gas Company has been legally obligated to pay for the investigation and cleanup as a result of the property damage at the Everett site caused during the years for which it had coverage."

Century correctly says that the special verdict form (standing alone) could easily have led the jury to conclude that once some of the on-site remediation was justified to cope with actual or threatened off-site pollution, all of the on-site remediation costs were covered by the policy. The oral instructions suggest that this was likely not the intended result.[11] But while an instruction might sometimes be so clear as to control an ambiguous special verdict form, here the special verdict form demanded an all-or-nothing award.

Boston Gas says that it proved off-site contamination, but this is not an answer to a claim that the special verdict erroneously presented an all-or-nothing choice. Under Hakim, some off-site contamination does not automatically justify recovery of

---

[11]The district court told the jury that "the plaintiff cannot recover for any costs that were incurred solely to clean up its own property." But other portions of the instructions--the district court went on to characterize "the cleanup costs" as an indivisible sum--cut the other way.

-16-

all on-site remediation.  As Hakim explained: "The policy covers cleanup costs incurred to remediate or prevent further migration of the contaminants to the off-site waterways.  Costs incurred for the sole purpose of remediating the Hakims' property are barred by . . . the policy."  Id. at 1165-66.

Boston Gas also says that Century provided no evidence that would have allowed the jury to determine that some of the on-site costs were solely for the benefit of the site and not necessary to prevent further off-site pollution.  Yet substantial costs (Century says $3.5 million) were incurred to remove soils and for other work incident to a project undertaken in 2000 by DOMAC to expand its operations at the Everett site--or at least the jury could have so found.  These costs are part of the award against Century.

For example, among other steps, DOMAC removed contaminated soils and liquids from underground storage tanks-- these tanks were buried under the Everett site when DOMAC first purchased the property in 1970--at a cost to Boston Gas (under a sharing agreement with DOMAC) of around $1.6 million.  Century says that this was clearly done for the purpose of giving DOMAC a firm foundation for its own facilities and not as remediation or prevention of further off-site damage.

The fact that the jury verdict included the disputed costs shows only that the jury believed that some costs targeted

pollution that damaged or threatened off-site property. So we must remand for a new trial on this issue. This is a relatively narrow issue, but the amounts are not trivial. In all events, the principle is clear: only that remediation necessary to protect against off-site contamination is compensable; further costs, however useful to mitigate on-site contamination, are not.

Century says that it should have been given judgment as a matter of law as to a portion of these disputed costs--specifically, the $1.6 million allocated to the removal of the contaminated soils. Century argues, first, that the removal was indisputably for the purpose of the DOMAC expansion project and therefore excluded; and second, that the soil was contaminated by underground oil only after DOMAC purchased the property and Century's coverage ceased. We are not persuaded that the issue should have been taken from the jury.

The "purpose" of the removal may, as Century claims, have been to forward the DOMAC expansion; but the relevant question under the policy and <u>Hakim</u> is whether the removal of that soil was also objectively necessary because contaminants in the soil posed a threat to off-site property as well. Similarly, Century's claim that this all occurred after its policy coverage ended in 1969 begs the question; the covered "occurrence"--ongoing contamination--began before and continued during and lasted until after Century's period of coverage.

Century points to some evidence that the contamination of the soil in the tanks occurred during the 1970 project; but Boston Gas attacked the credibility of Century's expert witness, Richard Meehan, and offered evidence that the tanks may have been contaminated at some earlier point and that contamination generally had spread throughout the Everett site and beyond. This is for the jury to resolve. Sailor Inc. F/V v. City of Rockland, 428 F.3d 348, 354 (1st Cir. 2005).

Exclusion of Charles Anderson's supplementary expert report. Century next argues that the district court erred in precluding one of its expert witnesses, Charles Anderson, from supplementing his expert report after the expiration of the deadline for such responses as set by the district court. The test in such a case is abuse of discretion. Licciardi v. TIG Ins. Group, 140 F.3d 357, 362-63 (1st Cir. 1998); see also Nat'l Hockey League v. Metro. Hockey Club, Inc., 427 U.S. 639, 642 (1976) (per curiam).

In federal practice, an expert must ordinarily file a report, Fed. R. Civ. P. 26(a)(2)(B), kept current by supplementary reports if needed, id. 26(e)(2). The trial judge typically sets a schedule and may exclude non-complying evidence. Id. 26(a)(2)(c); Macaulay v. Anas, 321 F.3d 45, 50 (1st Cir. 2003). Here, November 30, 2004, was the deadline for the parties to serve reports containing their experts' complete opinions. The parties were to

-19-

conclude expert depositions by April 1, 2005, file rebuttal reports by April 22, 2005, and conduct rebuttal depositions by May 13, 2005.

Pursuant to this timetable, Century produced Anderson's report on November 29, 2004, and supplemented it with a report filed on March 11, 2005.  Anderson was to serve as Century's expert on the proper categorization of costs; Anderson attested that he would categorize Boston Gas' site-related expenditures as "legal costs, site investigation costs, remediation costs, and general business expenditures"-- presumably to aid the jury in determining which costs fell within Century's policy exclusions.

On September 16, 2005--approximately two months before trial was set to begin--Century produced a second supplemental report from Anderson, which contained (in Century's view) essential opinions related to Century's owned-property defense.  For instance, the report characterized certain expenses previously categorized as "remediation" as necessary for on-site construction activities but not remediation.  The new report also contained new analysis of the costs Boston Gas had incurred in the removal and disposal of the three underground storage tanks; Anderson planned to say this project was part of construction activity, not remediation efforts.

Boston Gas moved to strike Anderson's supplemental report, complaining that Century sought to inject an entirely new

theory of defense as to certain costs after the deadline for expert reports. Century answered that the tardy report was based on information that Boston Gas had itself belatedly disclosed on August 16, 2005; this data, Century claims, was previously unavailable to Century. The district court sided with Boston Gas and excluded the new report, saying the report was a major change and prior discovery available to Century undermined Century's claimed lack of notice.

From our vantage, this was a close call. Century has some basis for contesting Boston Gas' description of the reports as reflecting a "sea change," and Boston Gas could have asked to depose Anderson on his new adjustments. See Johnson v. H.K. Webster, Inc., 775 F.2d 1, 8 (1st Cir. 1985). But changes in position shortly before trial complicate scheduling; the district court's on-the-ground weighing of the factors has to be respected, absent a clear abuse, Thibeault v. Square D Co., 960 F.2d 239, 244 (1st Cir. 1992); and we are not disposed in this case to override its judgment. If the limited new trial ordered changes the calculus, that is a matter for the district court.

Jury instructions on "expected or intended" defense. Century's policy defines occurrence as "an accident, including injurious exposure to conditions, which results, during the policy period, in property damage neither expected nor intended from the standpoint of the [i]nsured." Massachusetts courts read such

-21-

clauses as exclusions, with the insurer bearing the burden of proof. Quincy Mut. Fire Ins. Co. v. Abernathy, 469 N.E.2d 797, 800 (Mass. 1984); see also McGinnis v. Aetna Life & Cas. Co. 494 N.E.2d 1322 (Mass. 1986). Placing the burden on Century, the district court asked the jury on the special verdict form to decide:

> Did Boston Gas Company intentionally cause or know to a substantial certainty that it was causing contamination of soil and groundwater at the Everett site in one or more policy years?

A "yes" answer to this question required the jury to identify the year or years in which Boston Gas "intentionally cause[d] or [knew] to a substantial certainty that it was causing such contamination." But the jury returned a "no" answer, rendering the exclusion inapplicable. On appeal, Century objects to the charge based on a remark made by the district court in explaining its special questions to the jury.

The remark was made by the district judge in seeking to differentiate between the type of knowledge required by this "expected/intended" exclusion and another "known loss" exclusion that Massachusetts courts read into such policies; the latter is a judicially created exclusion that prevents a policyholder from recovering for losses from damage that it knew existed before purchasing an insurance policy. See SCA Servs. Inc. v. Transp. Ins. Co., 646 N.E.2d 394, 397 (Mass. 1995).

The court described a known loss as reflecting "knowledge of damage before the policy becomes effective" as compared to the expected or intended damage exclusion, which involves "either intending during the policy year or knowing to a substantial certainty that it was contaminating during the policy year" (emphasis added).  Century says that the latter direction required the jury to disregard evidence, heavily relied on by Century, of Boston Gas' expectations in the years before the first Century policy went into effect.

Taken literally and in isolation, the underscored language might be understood as Century contends and might well misstate Massachusetts law; we can see no reason why knowledge prior to the policy year would not count against the insured.  But the chance of prejudice is limited because the pertinent charge as a whole (which Century did not trouble to quote) tended to convey the correct message and also because common sense tends to reject the notion that an earlier intention or expectation would not count.

Anyway, Century failed to object to the district court's arguable misstatement when the charge was given, Fed. R. Civ. P. 51(c).  Century did object to the district court's "expected or intended" instruction, but did so on grounds unrelated to the temporal aspect it now criticizes.  Cf. Colon-Millin v. Sears Roebuck de Puerto Rico, Inc., 455 F.3d 30, 40-41 (1st Cir. 2006).

The misstatement could easily have been corrected on the spot. The objection is therefore forfeit and we have dealt with the point for the sake of trial in successor cases.

Declaratory judgment. In addition to awarding the damages calculated by the jury, the district court granted declaratory relief requiring Century to indemnify Boston Gas for all future costs for investigation and cleanup at and around the Everett site. Century contends--as it did below--that the declaratory judgment is over-broad because it applies to possible damage from MGP operations at the Everett site that was not specifically litigated at the Everett trial.

For instance, Century claims that Boston Gas may use the declaratory judgment to compel Century to indemnify Boston Gas for costs incurred to clean up the Mystic River; although the river abuts the Everett site, Century says that no issue related to the cleanup of the river was adjudicated as part of the Everett trial. Century claims that these and some other future costs are "purely speculative," not the subject of any formulated clean-up plan, and may be subject to exclusions or defenses that Century was unable to raise or that were otherwise not at issue during the trial.

The district judge retains substantial discretion in deciding whether to grant declaratory relief, but--so far as its grant determines legal liabilities--our review may be more

searching.[12]   We are troubled neither by the claim of speculativeness--there were indications of further damage to the river--nor about the lack of a final remedial plan.  In the analogous CERCLA context, courts routinely enter declaratory judgments on liability for response costs or damages.  See Kelley v. E.I. DuPont de Nemours & Co., 17 F.3d 836, 844-46 (6th Cir. 1994).

But the declaratory judgment makes Century liable for "all costs that Boston Gas has incurred, and will incur, for investigation and cleanup at and around the Everett site." Century's obligations are defined by the policy and related liability rules and, although presumably not intended by the district court, the judgment could be read to sweep more broadly-- say, to encompass clean-up operations that are necessitated by future remediation of the Everett site property solely for the benefit of the new owner.

Surely the entry of declaratory relief in Boston Gas' favor should not preclude an insurer from contesting the amount of the requested costs or whether the work undertaken was consistent with compensable remediation efforts.  Cf. Foster v. United States, 922 F. Supp. 663, 664-65 (D.D.C. 1996); see also Am. Cyanamid Co.

---

[12]See generally Diaz-Fonseca v. Puerto Rico, 451 F.3d 13 (1st Cir. 2006); Ernst & Young v. Depositors Econ. Prot. Corp., 45 F.3d 530, 534 (1st Cir. 1995); Nat'l R.R. Passenger Corp. v. Providence & Worcester R.R. Co., 798 F.2d 8, 10 (1st Cir. 1986).

v. <u>Capuano</u>, 381 F.3d 6, 12 (1st Cir. 2004). Whether future costs may be covered by an exclusion (<u>e.g.</u>, for the insured's own property) or defense is not easily resolved in the abstract. One can imagine scenarios in which Boston Gas may seek recovery for costs that Century may deem covered by a defense not yet resolved or forfeit.

We conclude that as to future costs, Century cannot re-argue matters that have already been decided, but conversely, Boston Gas cannot properly seek to recover for future costs spent purely to remediate its own property where no threat exists of contamination outside the site. The district court will be able to determine the scope of litigation when a dispute arises, using doctrines like collateral estoppel, waiver, and the like to prevent relitigation of matters that have been, or could have been, decided.

By its literal terms the declaratory judgment could be read to encompass costs that are not recoverable under Century's policy; the district court may not have considered that requiring Century to indemnify Boston Gas for all costs related to "investigation and cleanup" may apply more broadly than it intended. On remand an adjustment is needed in order to clarify that Boston Gas' entitlement extends only to costs incurred for remediation not barred by the terms of Century's policies and consistent with the findings of the jury.

Statutory prejudgment interest. Mass. Gen. Laws ch. 231 § 6C provides:

> In all actions based on contractual obligations . . . interest shall be added by the clerk of the court . . . at the rate of twelve per cent per annum from the date of the breach or demand. If the date of the breach or demand is not established, interest shall be added . . . at the rate of twelve per cent per annum from the date of the commencement of the action.

Based on this provision, the district court calculated prejudgment interest (roughly $2.5 million) as running from the various dates that Boston Gas incurred expenses for which it was entitled to indemnity from Century. For purposes of this calculation, Boston Gas submitted dated invoices for all of these expenses.

Century argues to us, as it did in the district court, that interest should instead run from October 22, 2002--the date on which Boston Gas filed the action--with respect to expenses incurred before that date. (Both agree that interest on expenses incurred after the filing date accrues only from the dates they were incurred.) It says that the date of breach or demand has not been "established" because there was no jury finding; and, further, no breach or demand occurred before suit was filed because Boston Gas had not requested indemnification for specific expenses. Our review on this claim is de novo. See R.I. Charities Trust v. Engelhard Corp., 267 F.3d 3, 5 (1st Cir. 2001).

-27-

Massachusetts courts have repeatedly stated that, where a case is tried to a jury, the jury is to pass on the question of whether and when (for purposes of section 6C) breach occurred or a demand was made. Deerskin Trading Post, Inc. v. Spencer Press, Inc., 495 N.E.2d 303, 308 (Mass. 1986) (in jury case neither trial judge or appellate court can decide issue); see also Berish v. Bornstein, 770 N.E.2d 961, 979-980 (Mass. 2002). Here, neither party sought a special verdict finding on this question.

Federal courts in diversity cases are bound to follow state substantive law, but whether a judge or jury should decide an issue is a matter of court practice or procedure. Byrd v. Blue Ridge Rural Electrical Cooperative, Inc., 356 U.S. 525 (1958), expressly decided that the distribution of issues between judge and jury is "not bound up with rights and obligations," so as to commit a federal court to follow the state rule. Id. at 538; see also Hanna v. Plumer, 380 U.S. 460, 465 (1965); Mayer v. Gary Partners & Co., 29 F.3d 330, 333 (7th Cir. 1994).

Boston Gas is entitled, under Massachusetts law, to prejudgment interest at the statutory rate from the date of "breach or demand"; but in a federal court federal practice governs who determines that date. Our case law does not appear to have directly addressed this question before. Occasionally, on this or like issues, we have referred to state practice, e.g., Saint-Gobain Indus. Ceramics Inc. v. Wellons, Inc., 246 F.3d 64 (1st Cir. 2001)

-28-

(where no one seems to have argued that federal law should govern), but without a considered holding.

In federal practice, usually the jury is required to pass on all elements of damages; yet prejudgment interest is routinely added by the judge on motion to alter or amend the judgment under Fed. R. Civ. P. 59(e), e.g., Osterneck v. Ernst & Whinney, 489 U.S. 169, 171-72 (1989), and the district judge decides based on "considerations of fairness" whether to award interest at all and at what rate. Bd. of County Comm'rs of Jackson County v. United States, 308 U.S. 343, 352 (1939).

If interest were required to be awarded from a certain date by right, and there were a genuine factual dispute as to that date, then a federal court might yield to the jury, cf. Erskine v. Van Arsdale, 82 U.S. (15 Wall.) 75, 77 (1872); but even this is not beyond doubt since judges do determine facts in certain contexts, see Markman v. Westview Instruments, Inc., 517 U.S. 370, 378 (1996). The inquiry, to the extent that the seventh amendment is invoked, is largely historical. Id.

We need not engage in that inquiry here because we are convinced that no factual questions are implicated. The material facts are known and undisputed. On August 4, 1995, Boston Gas wrote to Century to give notice of the contamination:

> This will serve as notice of circumstances indicating the potential for claims against Boston Gas Company ("Boston Gas") arising out of alleged contamination . . . . You are

> hereby notified that Boston Gas claims entitlement to coverage under the referenced policies with respect to any claims or liabilities that may arise out of any contamination of the referenced sites.

Century responded on July 22, 1996, writing that until it could "obtain additional factual information," it will "reserve all rights, at law and in equity, to disclaim coverage under the terms, conditions, definitions and exclusions of the policies."

The letter explicitly warned that it "should not be understood as either accepting or disclaiming coverage but, rather, as notice to Boston Gas that coverage may be in jeopardy under the policies." Century says that, thereafter, Boston Gas never requested payment for specific expenses or submitted particular invoices to it for reimbursement, and Boston Gas does not claim otherwise. In other words, until this suit there was never a refusal to pay any invoice, either specifically or categorically.

On the present record, no date of "breach or demand" has been established, and Boston Gas is entitled to statutory interest only from the date of filing suit (or later, for those expenses that post-dated the filing). The Supreme Judicial Court has held that a demand should inform the defendant "of the basis and extent of its obligations, as well as the fact that performance was then due." Town of Lexington v. Town of Bedford, 393 N.E.2d 321, 324 (Mass. 1979). Boston Gas' letter, which gave notice only of the "potential" for claims (presumably to satisfy notice requirements),

did not do so; it was not an "unequivocal demand[] for payment." Gen. Dynamics Corp. v. Fed. Pac. Elec. Co., 482 N.E.2d 824, 830 (Mass. App. Ct. 1985).

In allowing interest from the dates of the invoices, the district court relied on Sterilite Corp. v. Continental Casualty Co., 494 N.E.2d 1008 (Mass. 1986), holding that an insurer who breached its duty to defend was liable for interest from the dates that the insured, "on notice that the defendant would refuse to pay for those expenses, was forced to pay those expenses itself." Id. at 1011. But Century had not disclaimed coverage, cf. Protective Life Ins. Co. v. Dignity Viatical Settlement Partners, L.P., 171 F.3d 52, 55 (1st Cir. 1999), and was not bound to make payments in the absence of specific requests to do so.

Missing policies. Century's last objection is easily dispatched. Century challenges the jury's findings on the limits of liability for the insurance policies Century issued to Boston Gas between 1951 and 1960. Although Boston Gas sought coverage for liabilities at the Everett site under the Century policy in effect from 1966-1969, Boston Gas--presumably to protect its own interests in subsequent cases and in settlement discussions-- requested that the jury find the limits of Century's policy XPL- 3392, which was in effect from 1951 through 1960. The jury concluded that the policy had an annual limit of $500,000 during

the 1952-54 time period, and a limit of $1,000,000 in all the other years.

Neither party produced a copy of policy XPL-3392; possibly the policy, over a half century old, was lost or perhaps destroyed at some point in the intervening years. Under Massachusetts law, the loss of a policy is not fatal to a claim: the proponent of the policy simply bears the burden of proving-- e.g., by business records and expert testimony--the prior existence and terms of the policy. Rubenstein, 694 N.E.2d at 384. Century now claims that the jury's findings as to the terms of policy XPL-3392 are unsupported by the evidence.

At trial, evidence was produced by both sides as to Century's insurance practices during the relevant period; for example, Boston Gas placed in evidence a 1951 Century insurance policy issued to Brooklyn Union Gas Company. Boston Gas relied heavily on the language of the 1960-66 policy, XPL-5607, which stated that it was a renewal of XPL-3392; Boston Gas' former director of risk management, Stephanie Shepard, testified that the term "renewing" meant that XPL-5607, which had an annual limit of $1,000,000, renewed a prior policy with similar coverage and limits.

Boston Gas also relied on testimony about reinsurance practices from Judith Harnadek, an assistant vice-president in Century's claim handling department, to show that XPL-3392 was

valued somewhere between $500,000 and $1,000,000. Century, in turn, attempted to impugn Shepard's knowledge of insurance practices during the 1950s and said that Harnadek's testimony established that Century's insurance practices were highly variable and the policy limits of XPL-3392 could not be determined with any certainty.

The jury's determination of raw facts stands unless it is unsupported by any rational view of the evidence. Marcoux v. Shell Oil Prods. Co. LLC, 524 F.3d 33, 40 (1st Cir. 2008). Here a jury could reasonably be persuaded by Boston Gas' evidence showing that XPL-5607 served as a renewal of the earlier XPL-3392, as well as by the documentary evidence of contemporaneous policies issued by Century to other manufactured gas companies. Century produced evidence casting doubt on Boston Gas' position, but nothing that compelled a different finding.

Conclusion. The questions specified below will be referred to the Massachusetts Supreme Judicial Court for its consideration. We have decided all other issues, confirming that the certified issues do affect the ultimate outcome. The questions are as follows:

> 1. Where an insured protected by standard CGL policy language incurs covered costs as a result of ongoing environmental contamination occurring over more than one year and the insurer provided coverage for less than the full period of years in which contamination occurred, should the direct liability of the sued insurer be pro rated in

-33-

some manner among all insurers "on the risk," limiting the direct liability of the sued insurer to its share but leaving the insured free to seek the balance from other such insurers (see pages 9-13, above) ?

2. If some form of pro rata liability is called for in such circumstances, what allocation method or formula should be used (see page 13, above)?

3. If a single insurer in such circumstances is subject to liability under more than one policy and each policy has a separate deductible or self-insured retention, should the insured be able to collect covered losses from a single policy subject only to that policy's deductible or self-insured retention, or should liability be reduced by the sum of the applicable self-insured retentions, effectively allocating total liability across the policies of that insurer in effect during the contamination period (see page 7 and note 4, above)?

We would also welcome any additional observations about relevant Massachusetts law that the Supreme Judicial Court may wish to offer.

The clerk of this court is directed to forward to the Massachusetts Supreme Judicial Court, under the official seal of this court, a copy of the certified questions and our decision in this case, along with a copy of the briefs and appendix filed by the parties in this case. We retain jurisdiction over this appeal and will frame our ultimate decision and judgment after receiving such guidance on the certified questions as the SJC may be prepared to give. No costs will be taxed at this stage of the proceedings,

but the issue may be revisited after we have received the answers to the certified questions.

It is so ordered.