**BOSTON GAS COMPANY d/b/a Keyspan Energy Delivery New England, Plaintiff,**

v.

**CENTURY INDEMNITY COMPANY, Defendant.**

**Civil Action No. 02–12062–PBS.**

United States District Court, D. Massachusetts.

June 28, 2011.

Julie F. Pruitt Barry, Nutter, McClennen & Fish, LLP, Boston, MA, Mark H. Kolman, Dickstein Shapiro, Morin & Oshinsky LLP, Washington, DC, for Plaintiff.

David B. Chaffin, White and Williams LLP, Boston, MA, Jeehae Jennifer Koh, Barry H. Goldstein, O'Melveny & Myers LLP, New York, NY, for Defendant.

### MEMORANDUM AND ORDER

PATTI B. SARIS, District Judge.

### INTRODUCTION

Boston Gas seeks indemnity from Century for costs incurred in remediating environmental contamination at its former manufactured gas plant sites. The site at issue in these motions, Commercial Point, was the subject of a nine-day trial in 2007. The jury returned a verdict in favor of Boston Gas for approximately $1.7 million, but judgment was never entered. In the interim, the First Circuit and the Massachusetts Supreme Judicial Court ("SJC") have ruled on issues raised by Century's appeal of the verdict on another site, Everett, and now the parties contest the impact that those rulings should have on the Commercial Point action. In the present motions, both parties request that judgment be entered in their favor.

### I. Background

Boston Gas operated a number of manufactured gas plants ("MGPs") in the latter half of the 19th and into the 20th centuries. These plants created substantial environmental contamination requiring remediation. Under Massachusetts state law, Boston Gas is liable for the costs of that environmental remediation. *See* Mass. Gen. Laws ch. 21E (2006). Boston Gas had purchased liability insurance policies from Century's predecessor, INA, providing for coverage between the years 1951 and 1969. Faced with environmental response costs at a number of former MGP sites, Boston Gas sought indemnity from Century for the costs of remediation, but Century argued that the clean-up costs were not covered by Boston Gas' policies.

So far, trials have been held on two sites, Everett and Commercial Point, before another judge of this Court. The Everett trial occurred first, in 2005; the jury found for Boston Gas, and Century appealed to the First Circuit. A primary subject of the appeal was the question of how costs should be allocated across multiple insurers in cases of so-called "long-tail claims" involving environmental damage occurring over an extended period of time. Based on governing state case law at the time, the District Court in the Everett trial utilized an "all sums" or "joint and several" allocation method, whereby an insurer is responsible for an insured's total remediation costs as long as some property damage for which the insured is legally obligated to pay occurs during the policy period. The First Circuit certified the allocation question to the Massachusetts Supreme Judicial Court, which ruled that the proper method of allocation was not joint and several, but rather pro rata; that is, each insurer should be required to pay only those costs associated with damage happening during its policy period. *See Boston Gas Company v. Century Indemnity Company*, 454 Mass. 337, 910 N.E.2d 290, 306 (2009).

The Commercial Point was tried in 2007, prior to the SJC's ruling on allocation. Boston Gas operated an MGP at Commercial Point from 1886–1930, and Boston Gas has spent approximately $2.7 million for environmental remediation at the site. The jury at trial was asked to determine the amount of Boston Gas' damages, which involved first determining Boston Gas' total liability and then subtracting any amounts excluded by the policy language.

The parties disagreed over the jury instructions. Based on the "all sums" theory of allocation, Boston Gas argued that the jury should only be asked whether property damage existed at Commercial Point at any point during Century's policy period. *See* Trial Tr., March 8, 2007 at 14 ("We don't have to prove that all of the damage to the entire site happened during their policy period. Once we've showed there's continuous damage during their policy period, under the caselaw in Massachusetts, they have to pay ... all sums of our liability, including for damage before the policy period and damage after the policy period.").

Century argued that, regardless of the allocation issue, the policies only required it to indemnify for third party liability; as such, Century requested that the jury be asked whether property damage *resulting in liability* occurred during Century's policy period. *See id.* at 19 ("This is a liability policy. So, let's just focus on not was there some damage on the site, but is it the damage for which they're being held liable."). A prominent theme of Century's third party liability argument at trial had been that, while groundwater contamination existed at the site, that contamination was mild and did not require remediation under the Massachusetts Contingency Plan ("MCP"), the governing regulatory scheme. *See id.* at 20 ("THE COURT: Well, as I understand the Massachusetts

law, if there is contaminated groundwater, ipso facto, there is liability. MS. SANTELLE [for Century]: That's not the liability they're addressing, your Honor. This is the disconnect."). Century's proposed verdict question would have emphasized that liability was required in order to trigger Century's duty to pay. *See* Century's Proposed Jury Questions, Doc. No. 527 ("Do you find that during any, some, or all of the years between 1951 and 1969, there was physical injury to property at the Commercial Point site for which Boston Gas is liable and is seeking coverage from Century Indemnity?").

The final version of the jury question on property damage (Question 1) seemed to favor Century's approach, asking: "Was the Commercial Point site exposed to hazardous materials in one or more years during the policy period, 1951 to 1969, and did the release of these hazardous materials *result in liability* from continuing contamination of soil, groundwater, air and/or sediment on the site (property damage)?" (emphasis added). In the oral instructions to the jury on Question 1, the Court stated, "If you find that the plaintiff has proven that there was property damage that resulted in continuing contamination, then the answer is 'Yes' for any year in which you so found." Trial Tr., March 8, 2007 at 136. This oral instruction did not include the requirement that such contamination had to have resulted in third party liability on the part of Boston Gas. The Court did specify later, though, in its instruction on the "damages" question (Question 5), that "the plaintiff is entitled to recover only that portion of its costs attributable to its liability or potential liability for contamination." *Id.* at 143. The jury answered Question 1 "Yes" for all of the policy years.

The verdict form also required the jury to make findings on whether certain costs were excluded from coverage. Two poten-

tial exclusions existed. The first was the "expected/intended" exclusion, under which the policies did not provide coverage for any damage that Boston Gas caused knowingly or intentionally. The second was the "owned property" exclusion, which barred coverage for any costs spent on remediating the insured's own property (as opposed to addressing liability for damage to third party property). The jury found that the owned property exclusion did apply to one area of the site (the "Keyspan upland" portion), but that the "expected/intended" exclusion did not apply.

Question 5, "Damages," asked: "What is the amount Boston Gas Company (or KeySpan) has been legally obligated to pay for the investigation and/or remediation as a result of property damage at the Commercial point site for which coverage was not excluded?" The Court instructed the jury on this question as follows:

> So, if you found that the exclusion for intentional contamination applies to one or more of the areas, any of these areas, then the plaintiff is not entitled to recover the costs of investigation and remediation as to those areas, and that's why it's broken out.
>
> The parties agree that the total costs incurred are about $2.7 million, but if you find that the exclusion for intentional contamination applies as to any one of these, then you need to deduct from the total the amount attributable to that area, and your answer to Question 5 will have to be the total less the area that you find is excluded.

*Id.* at 144. The Court only mentioned the intentional contamination exclusion, not the owned property exclusion. The jury answered Question 5 with the amount of $1,699,145.79. This was the exact sum of the remediation costs at the KeySpan upland area, which the jury had found excluded as "owned property," and the gen-

eral site investigation costs. The amount of the remediation costs at the Keyspan upland area was undisputed at trial.

After trial, Century filed a motion to "correct the verdict," arguing that the jury had mistakenly entered the costs of investigating the whole site and remediating the KeySpan area, (to which the owned property exclusion applied), instead of subtracting that amount ($1,699,145.79) from the total remediation cost ($2,717,693.44) to calculate what Century argued should be the final damages number ($1,018,547.65). Boston Gas disputed this argument and filed its own post-verdict motion, requesting entry of judgment and arguing that it deserved judgment as a matter of law on the owned property issue. It argued that because there was uncontested evidence of impact to air at the site, Boston Gas could not be subject to the owned property exclusion because it did not own the air. These post-trial motions have not yet been ruled on.

## II. Discussion

### A. *Allocation*

After the appellate rulings in the case establishing that pro rata allocation was the appropriate framework, Century filed a new motion requesting entry of judgment in its favor for Commercial Point, arguing that under the pro rata approach, it was only obligated to pay for the amount of damage that occurred during its policy period. The SJC held that where the timing of contamination is not clear, and as such a "fact-based allocation" of damages is not possible, the proper method of determining each insurer's share is a "time on the risk" method. *See Boston Gas Company v. Century Indemnity Company,* 454 Mass. 337, 910 N.E.2d 290, 316 (2009). In this methodology, "[t]he total amount of damages should be divided by the total number of years to yield the

amount of damage that is fairly attributable to each year." *Id.* (internal citation omitted).

Century now argues that Boston Gas should be bound, under the doctrine of judicial estoppel, by its statement at trial that contamination has been continuous at the site since the beginning of MGP operations through "today," meaning 2008. Century would have the Court perform an allocation based on this span of years and enter judgment based on that result. Boston Gas retorts that the jury verdict already represented a fact-based allocation, and that the Court should therefore enter judgment based on the original verdict.

The core of the disagreement is over what the verdict question on property damage from the 2007 trial actually asked. That question stated, "Was the Commercial Point site exposed to hazardous materials in one or more years during the policy period, 1951 to 1969, and did the release of these hazardous materials result in liability from continuing contamination of soil, groundwater, air and/or sediment on the site (property damage)?" It then provided spaces for check marks next to a list of each of the years within the policy period.

■ Boston Gas argues that because the question specified that damage during the policy period had to result in liability, the jury actually performed a fact-based allocation of damages to each policy year. The Court disagrees. As Century argues, the inclusion of liability in the verdict question did not render the jury verdict a fact-based allocation. Instead, it simply served as a "trigger." Pursuant to the language of the policy, Century had no duty to pay even under the all sums theory unless there was third party liability resulting from property damage during Century's policy period. This required the jury to find such third party liability during the policy period in order to trigger

Century's obligation to pay. Critically, however, while the jury did find that damage occurred during each of the years between 1951 and 1969, it did not find the *amount* of damage that happened during each year. Even more importantly, the damages question on the verdict questionnaire did not state that it was asking the jury to find Boston Gas' damages for environmental liability deriving *only* from Century's policy period.

Judge Zobel has already stated that the case was tried on the "all sums" theory, and this is the law of the case. *See* Tr., April 13, 2010 at 10 ("My view is not that whatever goes—whatever happens from here on in, it has to be done on an allocation formula as described by the SJC—and not on a joint and several liability, which is what I tried in both of those cases."). As Judge Zobel explained with regard to the Everett site,

> The damages the jury found may not be the same under a pro-rata allocation because it was not asked to determine the start and end dates of the contamination which are essential facts for a pro rata finding. Therefore, I cannot fairly say that the evidence that was adduced, the arguments that were made and the court's rulings, instructions and questions to the jury would have been the same had the trial proceeded on a pro rata approach. This verdict tried on one theory cannot, without some finesse, support another, very different theory.

Memorandum on Remand, March 18, 2010 at 3. While it is true that the Everett site presented a different set of issues, Judge Zobel's logic nonetheless applies to Commercial Point.

■ As such, the Court will not enter judgment on the verdict as issued, since that verdict was not specific enough to constitute a fact-based allocation of property damage to Century's policy period.

Instead, the Court must decide, moving forward, how the damages allocation should be performed. If a specific, fact-based allocation of liability is not possible, Century's liability should be derived from a time-on-the-risk allocation pursuant to the SJC's ruling. It is within the district court's discretion to determine where the time on the risk method is appropriate. *See Boston Gas,* 910 N.E.2d at 316 ("Given the factual complexities of cases of this sort, we defer to trial judges in the first instance to determine whether losses can be allocated based on the amount of property damage that in fact occurred during each policy period, or must instead be allocated on the basis of each insurer's time on the risk.").

The question is whether an accurate, fact-based allocation of damages to different policy years is possible. If not, the time on the risk method of allocation is the appropriate method in this case. The two sides agreed only on one aspect of the timing question, namely that groundwater contamination had been occurring continuously from the time that the MGP was operative through the time of remediation. *See* Trial Tr., March 8, 2007 at 23 ("THE COURT: They have evidence that there was contaminated groundwater. Indeed, there is a stipulation to that effect, as I understand it."). Century did dispute that any remediation was necessary to address this contamination.

All other timing issues were hotly contested. The two experts disagreed about whether soil contamination ceased in 1930, when the MGP shut down, or whether it continued after that date. Boston Gas argued that the timing of soil, groundwater and sediment contamination was continuous from the beginning of plant operations to the present. *See* Expert testimony of Boston Gas witness Neil Shifrin ("Shifrin testimony"), Trial Tr., March 5, 2007 at 65 ("The timing of the contamination is—was

and is basically from the beginning of the plant to present day. The kind of contamination is both soil, groundwater, and sediment contamination . . .").

Century's expert disagreed, opining that the contamination at several areas of the site occurred during plant operations only. *See* Expert testimony of Century witness Charles Anderson ("Anderson testimony"), Trial Tr., March 7, 2007 at 10 ("It's my opinion that the contamination in [Area A West] took place during the period of the operations of the facility"); 26 (with regard to the OCYC, contamination occurred "during the period of operations of the stills, likely around 1916. Operations ceased around 1930. So, in that time frame"); 43 ("The sediment contamination occurred during—from the 1890s, when the MGP began operations, and it would have ceased soon after the facility shut down[.]").

Other aspects of the timing question were acknowledged to be uncertain by both sides. For example, the disposal of several drums containing non-aqueous phase liquid ("NAPL") contributed to contamination of the site, and neither of the trial experts could say with any specificity when the drums were buried. *See* Shifrin testimony, Trial Tr., March 5, 2007 at 42 ("Q: . . . Do you have an opinion as to when this burial took place? A: My opinion is it took place after the MGP terminated"); Anderson testimony, Trial Tr., March 7, 2007 at 13 ("Q: Do you know when the drums were disposed in that area? A: No. It's unclear when the drums were disposed in that area").

Finally, the record is disputed about the timing of contamination of the sediments area of the site, with Century's experts arguing that it occurred during MGP operation and Boston Gas' expert arguing that it occurred continuously over time via underground leaching. *See* Shifrin testimo-

ny, Trial Tr., March 5, 2007 at 61 ("My opinion is that the sediment contamination primarily was caused from subsurface migration."); Anderson testimony, Trial Tr., March 7, 2007 at 39 ("My opinion—here, once again, is the fact that this is not being caused by landward migration of tars in this area.").

Given that almost every aspect of the timing of contamination at the site is subject to intense factual dispute or uncertainty, the Court finds the time on the risk method is the most appropriate and justiciable means of allocation.

## B. *Judicial Estoppel*

The fundamental change in the insurance law underlying this case has the potential to spur each party to adopt a position inconsistent with its earlier position. Because pro rata allocation is now the rule, Century now has an incentive to argue that the contamination was continuous over as long a period as possible (to reduce its pro rata share), and Boston Gas has an incentive to argue that the contamination was cabined in as narrow a period as possible (to maximize its recovery from Century).

 As stated on several previous occasions, the Court is committed to applying the doctrine of judicial estoppel in a fair and even-handed manner.

"As a general matter, the doctrine of judicial estoppel prevents a litigant from pressing a claim that is inconsistent with a position taken by that litigant either in a prior legal proceeding or in an earlier phase of the same legal proceeding." *InterGen N.V. v. Grina,* 344 F.3d 134, 144 (1st Cir.2003); *accord Pegram v. Herdrich,* 530 U.S. 211, 227 n. 8, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000). The doctrine's primary utility is to safeguard the integrity of the courts by preventing parties from improperly manipulating the machinery of the judicial system.

*New Hampshire,* 532 U.S. at 750, 121 S.Ct. 1808; *United States v. Levasseur,* 846 F.2d 786, 792 (1st Cir.1988). In line with this prophylactic purpose, courts typically invoke judicial estoppel when a litigant is "playing fast and loose with the courts." *Patriot Cinemas, Inc. v. Gen. Cinema [Cinemas ] Corp.,* 834 F.2d 208, 212 (1st Cir.1987) (quoting *Scarano v. Cent. R. Co.,* 203 F.2d 510, 513 (3d Cir.1953)).

*Alternative Sys. Concepts, Inc. v. Synopsys, Inc.,* 374 F.3d 23, 32–33 (1st Cir.2004). The case law has not established "inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel." *New Hampshire v. Maine,* 532 U.S. 742, 751, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001); *see also Thore v. Howe,* 466 F.3d 173, 181 (1st Cir.2006) ("The contours of the judicial estoppel doctrine are not sharply defined, and there is no mechanical test for determining its applicability."). In the First Circuit, however, it is "widely agreed that, at a minimum, two conditions must be satisfied before judicial estoppel can attach." *Synopsys,* 374 F.3d at 33. Those conditions are: "(1) the estopping position and the estopped position [are] directly inconsistent; and (2) the responsible party succeeded in persuading a court to have accepted its prior position." *Thore,* 466 F.3d at 182 (citing *Synopsys,* 374 F.3d at 33).

 Based on the jury's finding of contamination resulting in liability at the site in every policy year, the Court concludes that Boston Gas was successful in its argument that contamination at the site was continuous, at least through the end of the policy period. Therefore Boston Gas is bound by its argument that soil, groundwater and sediment contamination were continuous from the beginning of plant operations through the time of trial, and may not put forward any timing arguments contrary to this position.

## C. *Verdict Amount*

Century has argued that the jury's answer to the final damages question was a mistake, and that they mistakenly entered the costs of investigating the site and remediating the KeySpan upland portion instead of subtracting that amount from the total liability. The damages question asked, "What is the amount Boston Gas Company (or KeySpan) has been legally obligated to pay for the investigation and/or remediation as a result of property damage at the Commercial point site for which coverage was not excluded?" Century posits that the jury misread the question and did not see the "not." It argues that, because the jury found that the owned property exclusion applied to the KeySpan upland portion, the costs of that area should have been excluded from the damages amount. Boston Gas retorts that, under *Plummer v. Springfield Term. Ry.*, 5 F.3d 1, 3 (1st Cir.1993), the Court cannot inquire into "what the jurors were thinking when they chose the number that they did and whether their thinking was sound." Boston Gas claims that it is possible that the jury found that only $1,018,547.65 of the $1,699,145.79 in costs at the KeySpan area were expended for Boston Gas' owned property. According to Boston Gas, then, the jury subtracted $1,018,547.65 from the total costs, $2,717,693.44, to get the final result of $1,699,145.79.

Century points out that Federal Rule of Evidence 606(b) was amended post-*Plummer* to "respond[ ] to a divergence between the text of the Rule and the case law that has established an exception for proof of clerical errors." Adv. Comm. Note to FRE 606(b), 2006 Amendment (citing *Plummer's* statement that "A number of circuits hold, and we agree, that juror testimony regarding an alleged clerical error, such as announcing a verdict different than that agreed upon, does not challenge the validity of the verdict or the deliberation of mental processes, and therefore is not subject to Rule 606(b)."). Century argues that the jury made a clerical error in this case that is subject to judicial correction under Fed.R.Civ.P. 60(a) ("The court may correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record. The court may do so on motion or on its own, with or without notice.").

The jury had access to specific invoices that could have allowed it to determine with particularity what costs were spent on soil remediation as opposed to addressing third party property. The jury was also presented with a summary chart of the costs of remediating each of the different areas of the site, reproduced here:

| Activities | Past Cost | | |
|---|---|---|---|
| | Investigation | Remediation | Total |
| Dike Reconfiguration | $51,007.84 | $461,585.10 | $512,592.94 |
| Drum Removal | $28,955.85 | $41,932.77 | $70,888.62 |
| Area A (East and West) Total | $178,181.31 | $640,397.46 | $818,578.77 |
| OCYC Removal | $297,917.54 | $397,635.82 | $695,553.36 |
| Sediments | $322,994.29 | | $322,994.29 |
| General Site Investigation | $297,085.46 | | $297,085.46 |
| Total | $1,176,142.29 | $1,541,551.15 | $2,717,693.44[11] |

The KeySpan upland portion of the site includes the Dike Reconfiguration, the Drum Removal, and Area A. The total costs of these three sub-areas add up to $1,402,060.33. The addition of the General Site Investigation costs yields the $1,699,145.79 that the jury entered as its response to Question 5 on the verdict form. Century contends that the jury made a clerical error in entering this number as

the verdict rather than subtracting this number from the total damages.

Boston Gas argues that investigation costs are not included in the owned property exclusion, and therefore that the jury could not have included those costs in its calculation of the excluded amount. Even if true, the jury was not instructed on that point, and had no reason to know that investigation costs could not be excluded. Therefore this argument does not help to resolve the issue of whether the jury made a clerical error or rather made some substantive compromise.

Boston Gas' scenario is highly unlikely. In its view, the jury worked through each invoice for the KeySpan area, determined what amounts were spent to remediate Boston Gas' owned property, and derived an amount that corresponded exactly to the difference between the stipulated total cost and the stipulated costs at the KeySpan area plus the general site investigation costs. That said, Century's explanation of the verdict (that the jury simply did not see the word "not," and entered only those costs that it found were excluded) does not account for the inclusion of the general site investigation costs. The owned property exclusion was not even argued to apply to any areas of the site other than the Keyspan upland portion. Therefore the theory that the jury found all of the site investigation costs excluded under the owned property exclusion is similarly unlikely. It is highly probable that a mistake was made here, but the mistake appears to have been substantive rather than clerical.

There are several cases supporting the reconvening of the jury for evidentiary purposes to determine whether a verdict contained a clerical error. *See Myrtle v. Checker Taxi Co.*, 279 F.2d 930, 933 (7th Cir.1960) (correcting mistaken damages amount in jury verdict after reconvening and consulting with jury); *Woodworkers Tool Works v. Byrne*, 191 F.2d 667, 676 (9th Cir.1951) (where jury mistakenly transposed amounts for general and special damages, court amended the verdict on party's motion based on affidavit from jury foreman); *Sifers Corporation v. Arizona Bakery Sales Company*, 133 F.R.D. 607, 608 (D.Kan.1991) (where jury informed bailiff of error on verdict form after jury discharge, court permitted correction of verdict).

■ Unfortunately, the trial occurred over four years ago, and it is unlikely that any of the jurors would recall their deliberations, let alone the trial evidence, with sufficient precision to clarify the verdict. The Court therefore concludes that the verdict must be vacated because it is against the weight of the evidence. *See Jennings v. Jones*, 587 F.3d 430, 436 (1st Cir.2009) ("A trial court may grant a new trial on the basis that the verdict is against the weight of the evidence.")

Neither can the Court realistically resolve the question as a matter of law. The parties dispute whether the owned property exclusion for the Keyspan area was presented to the jury as an "all or nothing" choice. The First Circuit stated in its opinion on the Everett site than an "all or nothing" verdict form was not the correct approach to the owned property issue, as "only that remediation necessary to protect against off-site contamination is compensable; further costs, however useful to mitigate on-site contamination, are not." *Boston Gas Co. v. Century Indemnity Co.*, 529 F.3d 8, 17 (1st Cir.2008). For the Everett site, Boston Gas argued that "Century provided no evidence that would have allowed the jury to determine that some of the on-site costs were solely for the benefit of the site and not necessary to prevent further off-site pollution." *Id.* For Commercial Point, however, Boston Gas has stated that the jury had invoices in evidence that would have allowed the jury

to draw just that type of distinction, but has not explained how. The Court does not have an adequate record for determining whether the jury would have had an evidentiary basis for allocating the Keyspan costs.

Even if the Court had a better record to determine that the Keyspan costs were presented to the jury as indivisible, the bundling of the general site investigation costs with the Keyspan costs makes it unrealistic for the Court to simply subtract the $1.699 million from the total costs, as there is no legal ground for excluding investigation costs for areas other than the Keyspan upland portion. *See* Section D, *infra*. In light of this complication, the First Circuit ruling, and the general uncertainty about the jury's intentions, the Court will not rule on the verdict as a matter of law, nor will the Court correct the verdict under Fed.R.Civ.P. 60(a). Unfortunately, the question of what costs are covered at the Keyspan area will have to be retried.[1]

### D. *Owned Property Exclusion*

 Boston Gas argues that the jury erred as a matter of law in applying the owned property exclusion, because there was evidence of impact to air at the site, and Boston Gas does not own the air. However, the testimony at trial, as well as the evidence, demonstrated that there was minimal if any impact to air at the site. The contaminated soil did pose an inhalation risk, but even this risk was cabined. Century's expert aired his view as follows:

Q. Okay. So, one of the problems is that the air over the Boston Gas land might have been a danger to human health; is that right?

A. No, I don't think so, that that's the case at all. The inhalation risk is a confined space issue, and if you send a worker into an excavation, there's all sorts of training requirements. That would be what the risk is. It would be a worker in a confined space who may breathe this, not somebody who is walking on the surface of the site.

Trial Tr., March 7, 2007, at 112. Boston Gas' own report stated: "The Massachusetts Air Quality Standards relate to ambient concentrations of so-called 'criteria pollutants' (sulfer oxides, particulate, carbon monoxide, ozone, nitrogen dioxide and lead), which are not among the COPC [Constituents of Potential Concern] for the Site." Method 3 Risk Characterization of Boston Gas Commercial Point Property, June 1998, attached as Ex. 2 to Docket No. 572.

Furthermore, even if the inhalation risk posed by contaminated soils did constitute contamination of air for purposes of the owned property exclusion, the critical factor with regard to that exclusion is whether the contamination poses a risk to third party property. *See Hakim v. Massachusetts Insurers' Insolvency Fund*, 424 Mass. 275, 279, 675 N.E.2d 1161 (1997) (with regard to the owned property exclusion, "coverage is not barred if the cleanup is designed to remediate, to prevent or to abate further migration of contaminants to the off site property"); *Wasserman v. Commerce Ins. Co.*, 15 Mass.L.Rptr. 170, 2002 WL 31187681, at *7 (Mass.Super.2002) ("[T]he insurer was liable for all the clean up costs, including the cost of cleaning up the insured's property, so long as the purpose was to prevent further migration." (construing *Hakim*)). Given that the purpose of the insurance policies is to indemnify for liability to third parties, this interpretation of the owned property

---

1. This retrial will be very narrow, limited solely to the issue of what costs at the Keyspan area are subject to the owned property exclusion, and will not rehash the "expected-intended" or any other issue.

exclusion is a reasonable one. *See Allstate Ins. Co. v. Quinn Const. Co.*, 713 F.Supp. 35, 40–41 (D.Mass.1989) ("There is no question that the broad purpose of a comprehensive general liability insurance policy, so far as it relates to property, is to cover damage to ... other people's property." (internal quotation marks and alterations omitted)). It is true that Boston Gas does not own the air over its property; however, no third party does either, so if the risk does not extend beyond Boston Gas' own borders, there is no danger of third party liability. The jury's verdict on the owned property exclusion was not contrary to law.

### E. *Investigation Costs*

Century further contends that it is not obligated to pay for investigation costs under the language of the policies, arguing that those costs constitute defense costs and not indemnity. Boston Gas responds that this issue has already been preclusively decided, and refers to Judge Zobel's decision in the Everett trial that Boston Gas' damages could include the costs of investigation and remediation. *See* Everett Jury Verdict, Doc. No. 412, Question 8 ("What is the amount Boston Gas Company has been legally obligated to pay for the *investigation* and cleanup as a result of property damage at the Everett site ...") (emphasis added); *Boston Gas Company v. Century Indemnity Company*, 529 F.3d 8, 12 (1st Cir.2008) ("At trial, the jury awarded Boston Gas over $6.1 million in past remediation expenses; the district court also issued a declaratory judgment obligating Century to pay all future costs associated with the investigation and environmental cleanup of the Everett site."). Century first raised its investigation costs argument in its trial brief for the Commercial Point site [Doc. No. 528], but Judge Zobel retained the same format for the damages question that was used for the Everett trial.

Century emphasizes that its policy covers only "Ultimate Net Loss," defined as "the sum actually paid or payable in cash in the settlement or satisfaction of losses for which the insured is liable," and excluding "all loss expenses." The thrust of Century's argument is that the costs of investigating the contamination at a site constitute a "loss expense" rather than a loss, and therefore should not be covered. The definition of "loss expense" is ambiguous, and the Court notes as a baseline matter that "any ambiguities in the language of an insurance contract are interpreted against the insurer who used them and in favor of the insured." *Boston Gas Co. v. Century Indem. Co.*, 454 Mass. 337, 910 N.E.2d 290, 305 (2009).

In support of its argument, Century cites primarily to one Massachusetts Superior Court case, in which the court stated:

> The [insured's] act of hiring [a Licensed Site Professional] as required by the [Notice of Potential Responsibility ("NOR")] could be viewed as the functional equivalent of a party's retaining an attorney upon being sued. Thus, any testing by Toomey is a defense cost that the Gordons incurred in response to the NOR. The costs of clean-up, however, are the equivalent of damages upon resolution of a lawsuit, thus those costs fall under Preferred's duty to indemnify, if any, discussed below.

*Preferred Mut. Ins. Co. v. Gordon*, 2003 WL 21077026, at \*11 n. 26 (Mass.Super.2003). This analogy to the legal process appeared in a footnote, however, in the context of the court's analysis of the duty to defend, and whether that duty covered an insured's response to a Notice of Potential Responsibility from the Department of Environmental Protection in the absence of legal action. It is not persuasive precedent on the issue of whether

the costs of assessing the environmental damage at a site are covered by the duty to indemnify.

The costs at issue here went not to investigation by attorneys in anticipation of a lawsuit, but rather to scientific assessment of the damage at the site. Because this assessment was an indispensable step in the ultimate remediation process, the "investigation costs" actually at issue here are a subcategory of remediation costs. *See Martignetti v. Haigh–Farr Inc.*, 425 Mass. 294, 680 N.E.2d 1131, 1140 . n. 22 (1997) (noting that, under Mass. Gen. L. c. 21E, governing liability for environmental contamination, " 'Response' is defined ... as including *assessment,* containment, and removal") (emphasis added); *Oliveira v. Pereira,* 414 Mass. 66, 605 N.E.2d 287, 289 (1992) ("The judge found [the] joint owner of the land ... to be jointly and severally liable for the costs of assessment, containment, and removal of contamination at the site."); cf. 42 U.S.C. § 9601(23) (under equivalent federal statute, the term "removal" includes "such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances"). Because there is no definition of "loss expense" available in the policy or established case law, and because that term does not plainly include the investigation costs at issue here, those costs are not excluded from coverage.

## F. *Prejudgment Interest*

■■■ After the Everett appellate rulings were issued, Century calculated its pro rata share of damages and made a payment to Boston Gas for Commercial Point. Century argues that it is not obligated to pay prejudgment interest on that amount at the Massachusetts statutory rate of 12% per year. *See* Mass. Gen. Laws ch. 231, § 6C (governing prejudgment interest in contract actions). Century contends that a judgment has never issued on the Commercial Point site, and

as such prejudgment interest can only be calculated using the federal rate.

■■■ Mass. Gen. Laws ch. 231, § 6C provides that prejudgment interest shall be added "upon a verdict, finding, or order for judgment for pecuniary damages." "Section 6C's language unequivocally predicates prejudgment interest on a contractual breach that results in a judgment for pecuniary damages." *Protective Life Ins. Co. v. Dignity Viatical Settlement Partners, L.P.,* 171 F.3d 52, 55 (1st Cir.1999). The prejudgment interest statute "is designed to compensate a damaged party for the loss of use or unlawful detention of money. An award of interest is made so that a person wrongfully deprived of the use of money should be made whole for his loss." *Sterilite Corp. v. Continental Cas. Co.,* 397 Mass. 837, 494 N.E.2d 1008, 1011 (1986) (internal quotations and citation omitted). The Court is vacating the jury verdict in this case because the allocation timing question needs to be determined by a jury, and the verdict with respect to the Keyspan owned property exclusion is against the weight of the evidence. When Boston Gas' final damages have been determined by a "verdict, finding, or order for judgment," the Massachusetts prejudgment interest rate will apply. It has already been established in this case that the date from which prejudgment interest is to be calculated is the date on which this suit was filed. *See Boston Gas Co. v. Century Indem. Co.,* 529 F.3d 8, 22 (1st Cir.2008).

Century argues that because it made a payment prior to the entry of judgment, it should have to pay prejudgment interest on the amount of that payment only at the federal rate. It provides no support for this argument. Century made a payment *after* the jury had rendered a verdict. Interest at the state rate will run until the date of payment, and will be set off against

the total judgment. To the extent that Boston Gas makes demands for costs that are not covered by the jury verdict, Section 6C does not apply.

### G. *Past Damages and Declaration*

Boston Gas has also argued that it should be granted past damages and a declaration like that issued for the Everett site. Century has not responded to this argument. In the absence of opposition, the Court will issue a declaratory judgment in keeping with that contemplated by the First Circuit. *See Boston Gas,* 529 F.3d at 20.

### ORDER

Century's Motion for Entry of Judgment on Commercial Point, or in the Alternative, for a New Trial on the Timing and Allocation of Property Damage (Doc. No. 609) is **ALLOWED** with respect to damages and allocation to the extent provided in this opinion. Otherwise it is **DENIED.** Century's Emergency Motion to Correct the Verdict or in the Alternative Reconvene the Jury (Doc. No. 556) is **DENIED.**

Boston Gas' Motion for Entry of Judgment Under Rule 54(b) and 50(b) (Doc. No. 563) is **DENIED.**